**SO ORDERED.**

**SIGNED this 30 day of December, 2019.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                    CASE NO. 19-00677-5-DMW

JOSHUA DREWEY WADE
ANNE MARIE WADE
                                                          CHAPTER 13
        DEBTORS

### ORDER DENYING CONFIRMATION OF CHAPTER 13 PLAN

This matter comes on to be heard upon the Chapter 13 Plan ("Plan") filed by Joshua Drewey Wade ("Mr. Wade") and Anne Marie Wade ("Ms. Wade") (collectively "Debtors") on July 22, 2019 and the Chapter 13 Trustee's Objection to Confirmation filed by John F. Logan, Esq. ("Trustee"), Chapter 13 trustee, on July 30, 2019.  The court conducted a hearing in Raleigh, North Carolina on September 17, 2019.  Travis Sasser, Esq. appeared for the Debtors, and Michael B. Burnett, Esq. appeared for the Trustee.  Based upon the pleadings, the testimony of the Debtors and other evidence presented at the hearing, the arguments of counsel and the case record, the court makes the following findings of fact and conclusions of law:

1.      This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.  The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtors filed a voluntary petition ("Petition") for relief under Chapter 13 of the United States Bankruptcy Code on February 14, 2019. The court appointed the Trustee to fulfill the duties as provided in 11 U.S.C. § 1302.

3. Mr. Wade has worked as a human resources manager for Thrifty Office Furniture for approximately two years, and Ms. Wade is a staff assistant at Duke University. Mr. Wade also works part-time as a music director at the church ("Church") at which the Debtors are members. In 2015, Mr. Wade opened a florist shop that ultimately was unsuccessful and resulted in debts for which Mr. Wade is responsible. When he opened the florist shop, Mr. Wade reduced his employment hours at the Church and became responsible for withholding his income taxes from the compensation he received from the Church. Mr. Wade testified that instead of properly withholding taxes from his income, he used those funds for expenses related to the florist shop, resulting in unpaid tax debt.

4. The Debtors stated on their schedules of liabilities filed with the court on February 28, 2019 that they owed the Internal Revenue Service ("IRS") the amount of $12,000.00 as a priority unsecured claim. The Debtors did not list on their schedules any other priority unsecured debts owed to governmental units. On Official Form 122C-2 – Chapter 13 Calculation of Your Disposable Income ("Form 122C-2"), the Debtors deducted as a monthly expense the amount of $200.00 for tax payments, which equals the estimated $12,000.00 amount owed to the IRS divided by sixty, the length of the Plan's repayment period.

5. General unsecured creditors have filed claims totaling $169,623.47 in the Debtors' case. The Debtors are above-median income debtors, and the amount of the disposable income the Debtors must pay to their unsecured creditors is determined pursuant to 11 U.S.C. § 1325(b)(3). On Form 122C-2, the Debtors calculated that they have monthly disposable income in the amount

2

of $2,017.26. That amount was calculated using the average monthly income the Debtors received from all sources during the six full months prior to filing the Petition.

      6.      The Plan states that the Debtors have monthly disposable income of $1,889.98 "**NOT ACCOUNTING FOR LANNING ADJUSTMENT.**" A "*Lanning* adjustment," named for the United Stated Supreme Court decision in *Hamilton v. Lanning*, 560 U.S. 505 (2010), effectuates a change to the disposable income amount that is calculated using a debtor's past average monthly income, by accounting for known or virtually certain changes in a debtor's financial circumstances. No explanation for the potential *Lanning* adjustment is included in the Plan to make creditors aware of what the Debtors actually propose to pay into the Plan, and as noted by the Trustee in his Objection, the disposable income amount stated in the Plan, without even accounting for the *Lanning* adjustment, does not correspond to the $2,017.26 amount listed on Form 122C-2.

      7.      At the hearing, the Debtors explained that the projected disposable income stated in the Plan is less than the amount stated on Form 122C-2, because the Debtors' tax payment obligations are higher than estimated on Form 122C-2. The IRS filed a priority unsecured claim in the amount of $15,760.69, and the North Carolina Department of Revenue filed a priority unsecured claim in the amount of $3,345.31. Those claims total $7,106.00 more in priority taxes than the Debtors stated in their schedules and on Form 122C-2, and repayment of that amount through the Plan would reduce their disposable income by $118.43 each month, plus Trustee's fees associated with those disbursements. This reduction to the disposable income amount stated on Form 122C-2 is reasonable and should be permitted.

      8.      The Debtors also explained that in October of each year, members of the Church provide offerings in support of Church staff. The staff receives those offerings in November. Mr.

Wade testified that he also receives additional income from the Church in December of every year. The Debtors assert that the supplemental November and December income, which was included in the calculations to establish the Debtors' average monthly income during the six months pre-petition, should be "annualized" before being included those calculations. In other words, the monthly income amount that is used to derive the Debtors' monthly disposable income is inflated, because it includes once-annual income that was received during the six-month period used in the Form 122C-2 calculations. The annualization of the supplemental income received by Mr. Wade is appropriate, and a related reduction to the disposable income amount stated on Form 122C-2 should be permitted.

9.     The Debtors also identified at the hearing the primary *Lanning* adjustment to which they believe they are entitled and which would reduce the payment amount stated in the Plan. Beginning shortly after they filed the Petition, the Debtors began tithing regularly to the Church. Mr. Wade testified that the Debtors have not contributed regularly to the Church in the recent past, because the Debtors did not believe they could afford to make contributions to the Church. Mr. Wade estimated that the Debtors had not contributed to the Church for two or three years before the Debtors filed the Petition, and they have not contributed ten percent of their income in approximately nine years. He characterized the Debtors' failure to tithe as religious "disobedience." Both Debtors testified that they were reared with the belief that they should tithe, and they attribute, to some degree, the financial misfortunes that culminated in the filing of the Petition to their failure to tithe regularly in the past.

10.     Upon filing the Petition and ceasing regular payments on their unsecured debt, the Debtors determined that they were able to, and that they should, begin remitting funds to the Church. Mr. Wade testified that the Debtors intend to tithe to the Church during the pendency of

their Chapter 13 case, and the Debtors assert that their monthly disposable income should be reduced by $756.00 to account for these Church contributions.[1] The Plan, as proposed by the Debtors, would provide a 39 percent dividend to general unsecured creditors but would leave over $100,000.00 in general unsecured debt unpaid.[2]

    11.    Pursuant to 11 U.S.C. § 1325(b)(2),

> the term 'disposable income' means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended . . .
> (i) for the maintenance or support of the debtor or a dependent of the debtor . . . ; and
> (ii) for charitable contributions (that meet the definition of 'charitable contribution' under [11 U.S.C. §] 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in [11 U.S.C. §] 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made . . . .

11 U.S.C. § 1325(b)(2). Congress added the language excluding charitable contributions from disposable income as part of the Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No. 105-183, 112 Stat. 517 (1998).[3]

    12.    As noted by the United States Bankruptcy Court for the Middle District of North Carolina, "[a]side from [the] 15 percent cap, . . . the Bankruptcy Code offers little insight as to *how*, or more importantly *if*, bankruptcy courts are to evaluate a debtor's charitable contributions when calculating disposable income." *In re Gamble*, No. 11-80131, 2011 Bankr. LEXIS 2757, at *10 (Bankr. M.D.N.C. June 14, 2011). In *Gamble*, the debtors deducted from their income monthly charitable contributions that were three-and-a-half times higher than their average

---

[1] This amount is approximately 6.5 percent of the Debtors' gross monthly income.

[2] Some of the Debtors' general unsecured debt comprises non-dischargeable student loans, so although over $100,000.00 in debt would not be paid through the Plan, a lesser, but still substantial, amount would be discharged through the Debtors' case if the court were to confirm the Plan as proposed and the Debtors completed successfully that Plan.

[3] Congress amended the wording of § 1325(b)(2) through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), but those changes did not affect the substance of the 1998 amendment to § 1325(b)(2).

monthly contributions pre-petition. *Id.*, at *3.  The Honorable Catharine R. Aron determined that "bankruptcy courts are not to engage in a more thorough analysis of a debtor's charitable contributions than what is required by the plain language of § 1325(b)(2)(A)(ii)," and the court confirmed the debtors' plan. *Id.*, at *9-10, *12.

13.    Notably, Judge Aron did not include any discussion of the debtors' good faith in proposing a post-petition increase in their charitable contributions to the detriment of their creditors, possibly because those debtors had elected to file a Chapter 13 petition and commit to a repayment plan despite having no secured debt. *See id.*, at *11.  The language of § 1325(b)(2)(A) must be read in conjunction with the rest of § 1325, including that a plan be proposed in good faith.

> Although the plain language of § 1325(b)(2)(A) does not restrict the timing of a debtor's tithing or prevent a debtor from increasing the amount of a charitable contribution on the eve of bankruptcy or after a bankruptcy petition is filed, these are factors that ought be taken into consideration when looking at the totality of the circumstances to determine whether a debtor has proposed a chapter 13 plan in good faith and in compliance with § 1325(a)(3).

*In re Evje-Cavanagh*, 250 B.R. 107, 114 (B.A.P. 9th Cir. 2000).  The purpose of the 1998 Act, as stated in the House Report for the bill which became the Act, was to "protect[] the rights of debtors to *continue* to make religious and charitable contributions after they file for bankruptcy relief." H.R. Rep. No. 105-556, at 1 (1998) (emphasis added).  The court should examine closely a plan which proposes to begin charitable contributions post-petition that were not a part of the debtor's expenses pre-petition.

14.    In *Evje-Cavanagh*, the bankruptcy court found that the debtors' plan, which provided for ongoing charitable contributions despite the debtors reporting no pre-petition contributions, was proposed in good faith. *See* 250 B.R. at 114.  The court based its ruling on the debtors' testimony regarding the female debtor's past tithing; the church's financial assistance to the debtors pre-petition when they experienced financial hardship, making the debtors feel that it

6

would be inappropriate to tithe while receiving aid; and the male debtor's recent decision to become a member of his wife's church. *Id.* The appellate court did not reverse the bankruptcy court, but it did note that "the fact that a charitable contribution may satisfy § 1325(b)(2)(A) does not render irrelevant a debtor's purpose in commencing or increasing the amount of a charitable contribution." *Id.* at 115; *see also In re Stanley*, 296 B.R. 402, 409 (Bankr. E.D. Va. 2002) (noting that even though the debtor's proposed charitable contribution was less than fifteen percent of his gross income, the amount was excessive compared to the debtor's proposed plan payment and dividend to unsecured creditors).

15. In this case, the court does not question the sincerity of the Debtors' belief that they should tithe; however, the Debtors' testimony established a prolonged history of choosing not to contribute to the Church in order to pay for other expenses or endeavors which culminated in the Debtors' Petition. Although the Debtors' vehicles were not discussed at the hearing beyond Mr. Wade's testimony that he incurs expenses driving to and from the Church, the case record reflects that the Debtors own a 2016 Ford F150 which they purchased for $48,191.67[4] on September 12, 2017, and for which the Debtors have a contractual monthly payment of nearly $700.00. Under the specific circumstances of the Debtors' case, a plan that proposes to contribute the amount of $756.00 to the Church each month to the detriment of unsecured creditors, when the Debtors did not contribute regularly before filing the Petition, is not proposed in good faith. The Debtors should not be permitted to pursue their salvation on the backs of their unsecured creditors.

16. The Debtors assert that in its analyses of the proposed contributions and of the Debtors' good faith generally, the court should place weight on the fact that Mr. Wade's secondary, voluntary employment at the Church triggers the disposable income which the Debtors seek to

---

[4] This amount includes "negative equity" in the amount of $9,812.09 from the trade-in of a vehicle in conjunction with the purchase of the Ford F150.

7

contribute back to the Church. The Debtors argue that they should be given latitude regarding how they spend a portion of the disposable income that is generated through Mr. Wade's employment at the Church, presumably because the unstated alternative would be for Mr. Wade to cease that employment and eliminate the corresponding disposable income. The court is not persuaded by this argument. Mr. Wade has a myriad of reasons for retaining his part-time employment at the Church. It is apparent he enjoys the work, and it provides additional support for his family during and after his bankruptcy case. Even if the disposable income is triggered by secondary and voluntary employment, the use of those funds during the pendency of a Chapter 13 case remains subject to the same good faith analysis as is applied in all Chapter 13 cases.

17. The amount that the Debtors have proposed to exclude from their disposable income for charitable contributions is excessive and is not indicative of a good faith plan to repay creditors. The Plan, as proposed and clarified at the hearing, should not be confirmed. The Debtors should be permitted to file an amended plan which proposes a larger dividend to the Debtors' general unsecured creditors; now therefore,

It is ORDERED, ADJUDGED and DECREED as follows:

1. The Chapter 13 Trustee's Objection to Confirmation be, and hereby is, sustained;

2. Confirmation of the Chapter 13 Plan be, and hereby is, denied; and

3. The Debtors shall have until January 24, 2020 to file an amended Chapter 13 Plan.

END OF DOCUMENT